**In re CA.S.,**

**In re CH.S.,**

**and**

**In re K.S.**

**L.D., Appellant**

No. 00–FS–802, 00–FS–803, 00–FS–804.

District of Columbia Court of Appeals.

Argued March 15, 2002.
Decided July 10, 2003.

Anthony R. Davenport, appointed by the court, for appellant.

Juliet J. McKenna, appointed by the court, for appellees Ca.S., Ch.S., and K.S. Keely Magyar, also appointed by the court, entered an appearance for appellees Ca.S., Ch.S., and K.S.*

Robert R. Rigsby, Corporation Counsel at the time the briefs were filed, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for appellee District of Columbia.

Before WAGNER, Chief Judge, and TERRY and RUIZ, Associate Judges.

TERRY, Associate Judge:

These consolidated appeals are taken from an order of the Superior Court declaring that Ca.S., Ch.S., and K.S. are neglected children. Appellant L.D. is the father of all three children; their mother is deceased. The court ruled that the children were neglected within the meaning of D.C.Code § 16–2301(9)(A) and (B) (2001) because their father had inflicted mental injury on them when he beat their mother. The court also ruled that the children were neglected within the meaning of D.C.Code § 16–2301(9)(C) because L.D., their only surviving parent, was incarcerated. We hold that there was insufficient evidence to permit the court to find that the children were neglected under D.C.Code § 16–2301(9)(A) and (B), but that there was sufficient evidence to sustain a finding of neglect under D.C.Code § 16–2301(9)(C). Accordingly, we affirm.

## I

Ch., Ca., and K., whose current ages are 11, 12, and 15, respectively, lived with their mother, E.S., until her death on March 1, 1999. Their father, L.D., was in and out of jail, but spent time with them when he was not incarcerated. In 1994 L.D. was sentenced to six to eighteen years in prison for a drug offense. He was released on parole from Shaw Residence II, a halfway house, on October 9, 1998.

One month before L.D.'s release from the halfway house, E.S. sought a civil protection order (CPO) against him. In her CPO petition, E.S. alleged that L.D. had beaten her at her home on three different dates in late August and early September 1998 and that, on the most recent of those occasions, he had also raped and sodomized her.[1] I.M., the sister of E.S., saw E.S.'s physical appearance after some of these beatings, and after the third such incident, on September 8, she took E.S. to the police station and then to the hospital. In her testimony at the neglect hearing, I.M. described E.S.'s appearance on September 8, stating that "her lips were swollen ... she had knots on her forehead, she

---

* Juliet McKenna withdrew from the case shortly after oral argument, upon being appointed as a Magistrate Judge of the Superior Court. Keely Magyar then entered the case as her successor counsel.

1. The petition alleged, in addition, that L.D. had beaten E.S. on another occasion a few years earlier.

had scratches behind her mark [*sic*] ... her whole face was swollen." I.M. also said that the children had observed E.S.'s condition on September 8 and were disturbed by it.[2]

L.D. signed a "Consent Civil Protection Order Without Admissions." The order required him to stay 100 feet away from E.S., but it also allowed him to have visitation rights with his children every other weekend following his release from the halfway house.

On March 1, 1999, E.S. was fatally stabbed.[3] Two days later the District of Columbia filed a petition alleging that the children were neglected within the meaning of D.C.Code § 16–2301(9)(A), (B), and (C). The children were placed temporarily in the care of their maternal grandmother and aunt, and in due course a fact-finding hearing on the neglect petition was held on three days in March and April 2000.

The government's main witness at the hearing was "Dr. A.B.,"[4] an expert in the field of clinical psychology. Dr. A.B. reviewed the case record and interviewed the children at the request of the Corporation Counsel. She spent at least four and a half hours with the children, during which time she interviewed them both as a group and individually. Dr. A.B. testified that all of the children described violence between their father and mother.[5] Dr. A.B. also stated that the children were afraid of their father and believed he was involved in the murder of their mother.[6] She explained the harmful effects of domestic violence on children, and concluded that her assessment of the children was that "they look like children that have been exposed to long-term trauma" and had signs of post-traumatic stress disorder due to violence between their parents.

The government also offered into evidence E.S.'s petition for a civil protection order, testimony from I.M. about E.S.'s physical condition at the time she filed the petition, and evidence that L.D. was currently in jail because his parole had been revoked for violating the earlier civil protection order.[7] There was also testimony from Dr. Charles Missar, a psychologist, and Leandre Cooke, a clinical social worker, but no transcript of the testimony of these witnesses has been included in the record by either party.

2. I.M. stated that Ch., the youngest child, went to his mother and asked what had happened and what was wrong, and that Ca. could not even look at her. I.M. could not recall K.'s reaction.

3. L.D. was at one time a suspect in the murder of E.S. As of the time of oral argument, however, he had not been charged with the crime.

4. The court granted a request to protect the identity of the doctor. She is identified in the record only as Dr. A.B., which may or may not be her actual initials.

5. One of the children told Dr. A.B. that he had actually seen his father hit his mother in the face sometime in 1998 or early 1999. Another child recounted hearing his mother cry for help while being beaten as he was waiting in the car for his father to come out of the house.

6. The children told Dr. A.B. that their mother was afraid of their father and that they had moved around because of her fear. One of the children reported that his father had told him in a serious manner that he was going to kill his mother. In addition, one of the children said that while he was playing a game with his father, his father wrote as part of the game that he was going to kill his mother.

7. There was evidence that L.D. had entered E.S.'s home on December 14, 1998, in violation of the CPO, when he brought the children back after a visit, and that while there he had assaulted E.S. and threatened her with a gun. In May 1999 he pleaded guilty to a charge of violating the CPO, and on August 27, 1999, his parole was revoked.

L.D.'s only witness was L.A.D., his sister. L.A.D. testified that she saw E.S. with a black eye on one occasion and that the children told her that "Mike," a friend of E.S., was the person who caused the black eye. L.A.D. also said that the children enjoyed spending time with their father and had never complained to her about him. The trial court, however, did not credit L.A.D.'s testimony because she could not remember the children's birthdays or addresses.

The court found that the children had "witnessed a pattern of abuse of their mother—their caretaker—by their father." Relying on this finding, the court ruled that the children were neglected within the meaning of D.C.Code § 16–2301(9)(A) and (B) because L.D. had intentionally inflicted mental injury on them.[8] The court also found that L.D. was incarcerated and, consequently, that the children were neglected within the meaning of D.C.Code § 16–2301(9)(C).[9]

## II

L.D.'s principal contention is that there was insufficient evidence to enable the trial court to find that the children were neglected under either D.C.Code § 16–2301(9)(A), (B), or (C).[10] In a neglect case, the government is required to prove its allegation of neglect by a preponderance of the evidence. D.C.Code § 16–2317(b) and (c) (2001); *see In re A.S.*, 643 A.2d 345, 347 (D.C.1994). On appeal, this court views the evidence "in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence." *Id.* (citations omitted). Furthermore, when any case is tried by a judge without a jury, "the judgment may not be set aside except for errors of law unless it appears that the judgment is plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (2001); *see also In re A.S.*, 643 A.2d at 347.

### A.  *D.C.Code § 16–2301(9)(A) and (B)*

This court has stated that evidence that a child is present during episodes of domestic violence is sufficient to prove mental abuse under D.C.Code § 16–2301(9)(A). *See In re L.D.H.*, 776 A.2d 570, 575 (D.C. 2001).[11] In the instant case, the trial court found that the children had

witnessed a pattern of abuse of their mother—their caretaker—by their father, which occurred over a period of

**8.** D.C.Code § 16–2301(9)(A) defines a "neglected child" as "a child ... who has been abandoned or abused by his or her parent, guardian, or other custodian." D.C.Code § 16–2301(23) goes on to define "abused," with reference to a neglected child, as "a child whose parent, guardian, or custodian inflicts or fails to make reasonable efforts to prevent the infliction of physical or mental injury upon the child ...." A judicial finding of "intentional and severe mental abuse" requires the District of Columbia to file a motion to terminate the parent-child relationship. D.C.Code § 16–2354(b)(3)(D).

D.C.Code § 16–2301(9)(B) alternatively defines a "neglected child" as "a child ... who is without proper parental care or control ... necessary for his or her physical, mental, or emotional health, and the deprivation is not due to the lack of financial means of his or her parent, guardian, or other custodian."

**9.** D.C.Code § 16–2301(9)(C) defines a "neglected child" as "a child ... whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity."

**10.** L.D. also argues that the trial court erred in finding that the infliction of mental injury was intentional. Because we hold that there was insufficient evidence showing that L.D. inflicted any mental injury on the children at all, we need not consider this argument.

**11.** In *L.D.H.*, the child's mother testified that the father had beaten, threatened, and stalked her over a ten-year period, and that the child was present during some instances of domestic violence. 776 A.2d at 572.

time before their mother's death (at least from August 1998). Based on the expert testimony of Dr. A.B., as further corroborated by Dr. Missar, Leandre Cooke, and [I.M.], the Court further finds that the respondents witnessed this pattern of abuse both directly and indirectly. In both ways, these young children *knew* that the violence was occurring because they lived with their mother and they relied on their mother. Indeed, Dr. A.B. testified that one of the respondents even described how he witnessed his father punch his mother and hit her in the face, and further described his mother's appearance after this episode of violence. [Emphasis in original.]

On the basis of these findings, the court ruled that the children were neglected under both D.C.Code § 16–2301(9)(A) and 16–2301(9)(B).

■ After reviewing the record, we hold that there was not sufficient probative evidence to support this conclusion. No direct evidence that the children had witnessed any domestic abuse—such as testimony by the children or other eyewitnesses to the alleged domestic violence— was presented at the hearing.[12] Instead, the court relied on the testimony of Dr. A.B., together with E.S.'s CPO petition and the testimony of other non-eyewitnesses, as a basis for its finding. None of this evidence, however, was competent to show that the children had in fact witnessed domestic violence between their father and their mother.

### 1. *The Testimony of Dr. A.B.*

■ The trial court relied heavily not only on Dr. A.B.'s expert conclusions, but also on her underlying testimony that the children had been exposed to domestic violence. Indeed, the court specifically cited Dr. A.B.'s description of an incident in which one of the children reported that he had seen L.D. hit E.S. The children's statements to Dr. A.B., however, were plainly hearsay, and the court could not rely on them in order to find that the children had actually witnessed domestic violence.

Appellees argue that Dr. A.B.'s testimony was not inadmissible hearsay because appellant never objected to it. *See Eldridge v. United States,* 492 A.2d 879, 883 (D.C.1985) ("once hearsay evidence is admitted without objection, it may be properly considered by the trier of fact and given its full probative value"); *Bullock v. United States,* 243 A.2d 677, 679 (D.C.1968) ("hearsay testimony to which no objection is made may be properly considered along with other evidence in determining the facts"). Appellant contends, on the other hand, that he did object to the testimony before the trial, although his objection was "not as clear as one would desire." We agree with appellant that the admissibility of the hearsay evidence was sufficiently contested to preserve the issue for appellate review.

Before the neglect hearing, counsel for L.D. told the court that he intended to call the children as witnesses at the hearing. The guardian *ad litem* and the District of Columbia, however, filed a joint motion to prevent them from testifying, and the trial judge granted the motion. During argument on the motion, the following discussion took place:

> MR. DAVENPORT [counsel for L.D.]: I believe that the Government

---

**12.** Counsel for L.D. sought permission to call the children as witnesses, but the court denied his request because their treating therapist said they would be emotionally harmed if they were required to testify.

would introduce, will attempt to introduce through some of its witnesses statements the [children] made in terms of both their mental state and the causes thereof. And without having the opportunity to actually make inquiry myself, we would simply be confined to what the Government's witnesses say they heard—

THE COURT: They're going to present expert testimony....

\*     \*     \*     \*     \*     \*

MR. DAVENPORT: So we would be left ... in a position where we would be seeking to cross-examine a witness about another potential witness's statement. That's impossible.

THE COURT: Isn't that the nature of expert testimony? Isn't it proper for an expert to rely, I mean, in addition to there being a number of hearsay exceptions which just readily come to mind in that context, but isn't an expert permitted to rely on hearsay testimony in connection with the doing of their evaluation and the preparation of their report? Isn't that permitted by the rules, and isn't that the nature of expert testimony in any event, and isn't that why in the context of this ... why I often have one expert on one side and another expert on the other, which presumably you're planning or at least contemplating offering me—

\*     \*     \*     \*     \*     \*

MR. DAVENPORT: Yes, Your Honor, but this is an instance where we also have the opportunity to determine whether or not the facts or statements which underlie or are relied upon by the expert who's tendering his or her opinion have been accurately reported or accurately interpreted. Absent that opportunity—

THE COURT: Well, that will depend upon what you do with the expert, right? I mean, in terms of whether or not something has been accurately reported or accurately interpreted, if an expert reaches a conclusion, while the rules don't specifically require that an expert outline his or her basis for the same, I mean, good examination requires the same.

We think this colloquy can be fairly read as a hearsay objection by L.D.'s counsel and a rejection of it by the court.

▆▆▆ Appellees nevertheless maintain that Dr. A.B.'s testimony regarding the underlying incidents of domestic violence was admissible under one of several hearsay exceptions.[13] The first of these is the exception for statements affecting medical diagnosis. *See Sullivan v. United States,* 404 A.2d 153, 158 (D.C.1979); FED. R. EVID. 803(4). This exception allows statements made for the purpose of medical diagnosis to be admitted so long as the statements are "not merely 'made to elicit evidence for use in the trial.' " *Sullivan,* 404 A.2d at 158 (citation omitted). In this case, however, Dr. A.B. was not the children's treating physician; her interview with the children was conducted at the request of the Corporation Counsel solely

---

13. One of these is the exception for statements of existing emotional condition, sometimes called the "state of mind" exception. *See Clark v. United States,* 412 A.2d 21, 25 (D.C.1980); FED. R. EVID. 803(3). This exception, however, is applicable only to statements made to Dr. A.B. by the children about their own state of mind at the time of their interview; it does not apply to descriptions of past acts or incidents witnessed by the children. *See* FED. R. EVID. 803(3) (exception does not apply to a "statement of memory or belief to prove the fact remembered or believed"). Thus statements by the children telling of their current fear of their father were admissible, but statements describing incidents they witnessed in the past were not.

in preparation for the doctor's testimony at the hearing. Under the rule as stated in *Sullivan,* therefore, the medical diagnosis exception does not apply.

Appellees suggest that this court has tended to construe the medical diagnosis exception broadly, especially in cases involving children. For example, in *Galindo v. United States,* 630 A.2d 202 (D.C.1993), we upheld the admission of statements made by a mother to a doctor during the doctor's examination of her child, in which the mother recounted what she knew about the defendant's sexual abuse of the child. We specifically noted, however, that the doctor's evaluation was for medical rather than legal purposes. *Id.* at 210. In this case, because Dr. A.B.'s evaluation of the children was strictly for the purpose of this litigation, cases such as *Galindo* are of no help to appellees.

■ Appellees also assert, relying on *In re Melton,* 597 A.2d 892 (D.C.1991) (en banc), that Dr. A.B.'s testimony was admissible to show the basis for her diagnosis of the children. In *Melton* the trial court found that the respondent was a paranoid schizophrenic who was likely to be a danger to himself or others and accordingly committed him to Saint Elizabeths Hospital. At the mental health trial, the government's only witnesses were two psychiatrists who testified about their diagnosis of Mr. Melton and their assessment of his future dangerousness. During their testimony, the doctors recounted events leading up to Melton's hospitalization, including the report of an incident at which neither of them was present, when Melton punched his mother in the nose.

On appeal Melton argued that this testimony was inadmissible hearsay.

We held that there was no reversible error in admitting the testimony because experts are permitted to rely on facts not in evidence as a basis for their opinions, so long as they are of the type reasonably relied upon by other experts in their field. *Id.* at 901.[14] We observed that psychiatrists reasonably rely on information from family members in reaching their conclusions, and thus that the experts who evaluated Melton were permitted to rely on such information. *Id.* at 902. Significantly for this case, however, we also noted that the testimony was admitted "only 'for the purpose of evaluating the reasonableness and correctness of the doctors' conclusions,' and not 'to establish the truth of the matters asserted by [the declarants].' " *Id.* at 901 (quoting the trial court's jury instructions).

The present case is distinguishable from *Melton* because here the court considered the hearsay statements for their truth, not simply as a basis for assessing Dr. A.B.'s conclusions. Dr. A.B.'s evaluation of the children led her to conclude that they had been exposed to long-term trauma and exhibited signs of post-traumatic stress disorder. The trial court, however, relied on the doctor's testimony to find that the children had actually witnessed domestic violence between their parents. Although *the doctor* was entitled to rely on the children's out-of-court statements about the beatings to form a basis for her opinion, *the court* could not consider those statements to prove the truth of what they asserted—*i.e.,* that the children actually

---

**14.** Among other authorities, we cited Rule 703 of the Federal Rules of Evidence, which states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or

made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

saw their father beating their mother. Dr. A.B.'s testimony was admissible under *Melton* only for a limited purpose: to establish a basis for her expert opinion that the children suffered from long-term trauma. The court erred when it relied on Dr. A.B.'s testimony to find that the children had in fact witnessed domestic violence.

### 2. *Other Evidence*

None of the other evidence in the record was sufficient to show that the children witnessed domestic violence or that their long-term trauma was the result of what they saw. From the testimony of I.M. the court could infer that E.S. had been beaten. Her testimony, however, did not permit the court to find that L.D. was responsible for the beatings or, more importantly, that the children were present when the beatings took place. Moreover, although the CPO petition did allege that L.D. had beaten E.S.,[15] the petition did not state that the children were present at any of the times that E.S. alleged she was beaten.

Additionally, although the court also based its ruling in part on the testimony of Dr. Missar and Leandre Cooke, their testimony has not been included in the record on appeal.[16] The duty to provide an adequate record is primarily on the appellant, *see Cobb v. Standard Drug Co.,* 453 A.2d 110, 111 (D.C.1982), but "an appellee also has a duty to insure an adequate record so the judgment in the latter's favor may be upheld . . . ." *Dulles v. Dulles,* 302 A.2d 59, 60 (D.C.1973); *see also Parker v. Stein,* 557 A.2d 1319, 1323 (D.C.1989); D.C. Ct.App. R. 10(c). Because neither party has provided us with a transcript, we have no way of knowing whether the testimony of Dr. Missar or Ms. Cooke showed that the children were present during instances of domestic violence. Moreover, even assuming that either or both witnesses so testified, the chances are that their testimony was hearsay, since it is doubtful that either Dr. Missar or Ms. Cooke was present during any such incidents.

Because there was no admissible evidence that the children actually witnessed incidents of domestic violence between their parents, we hold that the evidence was insufficient to permit the court to find that L.D. had inflicted mental abuse on them. Consequently, the trial court erred in finding that the children were neglected under D.C.Code § 16–2301(9)(A) and (B).[17]

### B. *D.C.Code § 16–2301(9)(C)*

D.C.Code § 16–2301(9)(C) defines a "neglected child" as "a child . . . whose

---

15. Although the CPO petition was also hearsay, appellant did not object to its admission; hence it could be considered for its truth. *See Eldridge,* 492 A.2d at 883.

16. The record does contain a report from Dr. Missar based on an interview he conducted with one of the children. The doctor's conclusions in that report are similar to the conclusions of Dr. A.B.

Although there is no transcript of Leandre Cooke's testimony in the record, the trial court described it in its findings of fact. According to those findings, Ms. Cooke met with E.S. at the hospital in December of 1998 after another incident of domestic violence. E.S. told Ms. Cooke that L.D. had entered her home after he brought the children back from a visit. When E.S. refused his pleas to resume their relationship, L.D. stayed in the home overnight and raped her repeatedly at gunpoint. In the morning, E.S. attempted to signal one of the children to call for help.

17. The court found that the children were neglected under subsection (9)(B), relying on the same evidence which it considered in finding that they were neglected under subsection (9)(A). Although subsection (9)(B) sets out a different standard of neglect from subsection (9)(A), see note 8, *supra, we* hold that the failure to prove that the children actually witnessed any episode of violence precludes a finding of neglect under either subsection.

parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child *because of incarceration,* hospitalization, or other physical or mental incapacity" (emphasis added). L.D. argues that the evidence was also insufficient to permit the court to find neglect under this section. We disagree.

L.D. first contends that he was not incarcerated at the relevant time. Although it is true that L.D. was not in jail on March 3, 1999, the date on which the neglect petition was originally filed, his parole was revoked and he was incarcerated again on August 27, 1999. The government moved on January 21, 2000, to amend its petition to include the fact of L.D.'s incarceration; the motion was unopposed and was granted on February 4, 2000. We hold that this was all that was needed to bring the case under section 16–2301(9)(C).

L.D. next argues that even if he was incarcerated, relatives were available and willing to care for the children. There is nothing in the neglect statute, however, which makes the availability of relatives relevant to a finding of neglect. The statute states simply that a child is neglected if a "parent ... is unable to discharge his or her responsibilities to and for the child because of incarceration ...." D.C.Code § 16–2301(9)(C). Whether this language permits (or requires) the court to consider the possible availability of other relatives to care for the child before making a finding of neglect appears to be an open question.

This court held in *In re T.J.,* 666 A.2d 1 (D.C.1995), that a mother who herself was unable to care for her child was nevertheless entitled to be heard on the question of who should be her child's custodian:

> [W]e conclude, on the facts of this case, that the mother's choice of a suitable custodian and the household in which her son should be reared should have been accorded far greater weight by the trial court, and it was error for the court not to give effect to the mother's choice of custodian for her child absent a showing, by clear and convincing evidence, that the choice would be clearly contrary to the child's best interest.

*Id.* at 15 (citation omitted). *T.J.* is factually distinguishable from the case at bar in several respects. Most importantly, it was an adoption case, in which the trial court had granted the foster mother's petition for adoption, thereby terminating the mother's parental rights forever. The instant case, by contrast, is a neglect case, in which the issue is whether the state should intervene in the first instance because the children have been neglected, as that term is defined in the statute. An argument might well be made that a parent's right to provide for the care of children by someone else is greater in a case such as this, before the state has taken custody upon an adjudication of neglect, and that the court should not have found these children to be neglected without considering their father's preference for someone to take care of them while he was incapacitated by incarceration.[18]

This is not an easy issue, but we conclude that we need not decide it on the present record. Even if the reasoning of *T.J.* were applicable to this case, there was no showing before the trial court that L.D. had made any alternative arrangements for the children's care. Indeed, the evidence established that he did not provide

18. We express no opinion, of course, on whether such an argument would be successful.

for them financially and had been incarcerated for most of their lives. It is true that the children had been placed with maternal relatives after their mother was murdered, but this was done pursuant to a court order, not at the behest of their father. It was also established that L.D. faced at least two and a half years, and possibly as many as twelve years, in prison. Absent any showing that other family members were or might be available to care for the children, or even that L.D. had anyone in mind to perform this function in the foreseeable future, we conclude that the trial court did not err in relying on the statutory language ("unable to discharge [parental] responsibilities ... because of incarceration") in finding the children to be neglected.[19]

### III

We hold that there was insufficient evidence to support the finding of the trial court that the children were neglected under D.C.Code § 16–2301(9)(A) and (B) because they witnessed domestic violence between L.D. and E.S., and accordingly we vacate that finding. We also hold, however, that the court's finding that the children were neglected under D.C.Code § 16–2301(9)(C) was supported by sufficient evidence. The adjudication of neglect is therefore

*Affirmed.*

---

19. For essentially the same reasons, we need not address L.D.'s related argument that the court erred in failing to find that the children were "deprived" of proper parental care and control.