855 A.2d 1117 (2004)
In re T.T.C.; E.T.O., Appellant,
In re T.C.; E.T.O., Appellant,
In re V.T.C.; E.T.O., Appellant.
No. 02-FS-136, C2-FS-152, 02-FS-153.
District of Columbia Court of Appeals.
Argued June 10, 2004.
Decided August 5, 2004.
Donald E. Exner, Greenbelt, MD, appointed by the court, for appellant.
*1118 David Hyden, Assistant Attorney General, for the District of Columbia. Robert J. Spagnoletti, Attorney General for the District of Columbia, Edward E. Schwab, Acting Deputy Attorney General, and Sheila Kaplan, Assistant Attorney General, were on the brief for the District of Columbia.[*]
Robert J. Warner, appointed by the court, for M.W.
Before STEADMAN, GLICKMAN and WASHINGTON, Associate Judges.
STEADMAN, Associate Judge:
Appellant birth father appeals from an adjudication of neglect as to his three sons under D.C.Code § 16-2301(9)(C) (2001).[1] At the time, appellant was incarcerated. Appellant's argument on appeal is that there was insufficient evidence to make a finding of neglect based on his inability to discharge his parental responsibilities due to incarceration because, in his view, no nexus was shown between his incarceration and the condition of his children. We disagree. We conclude that such a nexus was shown in the circumstances here and hence affirm.

I.
Appellant was incarcerated on February 13, 2001. At that time, his three sons, ages 7, 8, and 12, were left in the care of his longtime girlfriend, N.H.[2] For five years prior to his incarceration, appellant was raising his children with N.H. Approximately six weeks after the father was incarcerated, the birth mother, L.O.C., reentered the picture and demanded physical custody of the children. N.H. permitted the mother to move into the family apartment with the children and N.H. moved out, realizing that she had no legal standing to contest the mother's custody.
A few days later, the children knocked on the door of a neighbor when they were locked out of their own apartment in the rain. The neighbor, who testified at the evidentiary hearing, located a family member with whom the children could stay. Shortly thereafter, N.H. picked up the children and returned to the apartment. Both N.H. and the neighbor testified that crack cocaine paraphernalia were found on a dresser in the apartment, within easy reach of the children. N.H. called Child and Family Services for assistance and this neglect case ensued. At the first hearing in this case, on April 17, 2001, the trial court placed the children with N.H., where they have remained throughout the case.[3]
*1119 During the neglect proceedings, the government argued to the trial court that an incarcerated individual ipso facto cannot adequately discharge responsibilities for a child. Appellant asserted that he was not neglectful because he entrusted his children to the care of N.H. and maintained regular contact[4] with them. The trial court concluded that resolution of the issue turned on the definition of "discharge responsibilities." In finding that the father had neglected the children while incarcerated, the trial court relied, not on the government's argument, but on the fact that appellant "arranged for [N.H.] to care for his children without providing her the legal authority to act at all times in their best interest... [a]s a result, the children were placed in danger and neglected."[5]

II.
Appellant's sole argument on appeal is that there was not sufficient evidence to make a finding of neglect under D.C.Code § 16-2301(9)(C) (2001) because there was no nexus shown between his unavailability due to incarceration and his children's condition.[6] A neglect adjudication will only be set aside if it is "plainly wrong or without evidence to support it." In re Am. V., 833 A.2d 493, 497 (D.C.2003) (citing D.C.Code § 17-305(a) (2001)). Findings of neglect must be supported by a preponderance of the evidence. D.C.Code § 16-2317(c)(2) (2001). This court "must consider the evidence in the light most favorable to the government, giving full play to the right of the judge, as the trier of fact, to determine credibility, weigh the evidence, and draw reasonable inferences." Am. V., supra, 833 A.2d at 497 (citation omitted). Additionally, "the relevant focus for the court ... is the children's condition, not the father's culpability... because the purpose of the [neglect] statute is to protect the child from harm." In re J.W., supra note 6, 837 A.2d at 46 (citation omitted).
We have recognized that the government is "required to demonstrate the existence of a nexus" between a parent's physical or mental incapacity and an inability to provide proper parental care. In re E.H., 718 A.2d 162, 169 (D.C.1998) (proof of mother's illness alone not enough for neglect finding); see also In re B.L., 824 A.2d 954, 956 (D.C.2003) (sufficient nexus between parent's alcoholism and lack of proper parental care to support neglect *1120 finding). Whether this same requirement of a "nexus" is required under 9(C) between incarceration and an inability to discharge parental responsibilities is an issue this court has not explicitly ruled on. The statute, however, specifically states that a parent must be "unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity" in order for the child to be found neglected. D.C.Code § 16-2301(9)(C). Given the plain language of the statute, we find no reason, and appellee has offered none, to treat a parent's incarceration differently from the physical or mental incapacity of a parent and not require a "nexus" between the parent's condition and inability to discharge responsibilities for the child to support an adjudication of neglect.
Otherwise put, we cannot accept the government's argument to the trial court that incarceration per se constitutes an inability to discharge parental responsibilities. If the legislature wished to adopt that position, it would presumably have said so in plain language and not included incarceration among the several conditions to which the qualifying phrase applies. On the contrary, one might well expect that a custodial parent facing incarceration (just as, for example, a parent facing a long overseas assignment) could make satisfactory alternative arrangements for the care of his dependent children and there would be no call for the state to intervene. We recognized in In re C.A.S., 828 A.2d 184 (D.C.2003), as an open question whether the availability of other relatives to act as a child's caregiver is relevant to a finding of neglect under 9(C), although there is nothing in the neglect statute itself that makes such a circumstance relevant.[7]Id. at 193. In its interpretation of a statutory provision identical to 9(C), the New Hampshire Supreme Court set forth two factors to consider when determining if an incarcerated parent had neglected a child: (1) the appropriateness of the parent's choice of a substitute caregiver; and (2) the nature and amount of significant contact between the parent and child both before and during incarceration. In re Thomas M., 141 N.H. 55, 676 A.2d 113, 116 (1996). Appellant argues that under the factors in Thomas M., he has not neglected his children while incarcerated. Appellant's choice of caregiver for his children, N.H., is the same person whom the trial court found to be an appropriate placement for the children. Thus, appellant contends that the first factor was satisfied. Appellant contends that the second factor was fulfilled based on the trial court's finding that he had consistent visits, along with phone and letter contact, with his sons and neither party disputes that appellant and his girlfriend were the children's primary caregivers prior to his incarceration.
But this was not the whole story. The trial court clearly applied a standard under 9(C) that did not find appellant's incarceration to be per se neglectful.[8] In doing so, the trial court did recognize that appellant had contact with his children and that N.H. was a suitable caregiver. However, the trial court found that appellant's failure to "discharge his responsibilities" stemmed from his failure to provide N.H. with any legal right to custody of the *1121 children, such that their mother, who had an admitted crack cocaine addiction of fifteen years, was able to take custody of them from N.H. and almost immediately subject them to neglect.
Appellant argues that nothing in the record indicates that he had any opportunity to arrange for legal authority for N.H. and that the mother's actions in wanting custody of the children were not foreseeable. If appellant lacked an opportunity to make suitable arrangements, it was specifically because of his incarceration. As stated previously, N.H. testified that she found out appellant was incarcerated when court papers arrived in the mail. That fact cuts against any argument on appellant's part that, knowing he was going to be incarcerated, he took appropriate steps to discharge his responsibility toward his sons' physical and emotional well-being during his absence.
As to the mother's actions being foreseeable, N.H. testified that she had spoken with the mother in April 2000, ten months prior to appellant's incarceration, about the mother "wanting to get back with her children and she said she wasn't ready and she knew that she wasn't fit to take care of her children." There was also testimony that the mother had been collecting welfare benefits for the children even though they were not in her care.
That is not to say that the simple failure to make provision for the bestowal of some legal rights upon N.H. in and of itself constituted an abnegation of parental responsibility. It became relevant only because of subsequent events. It is quite clear on this record that when events did unfold that put the children at risk, i.e., the mother's arrival on the scene to claim custody, appellant was indisputably "unable to discharge his responsibilities" because he was incarcerated and no other individual was legally authorized to act on his behalf in assuming care of the children and challenging the mother's fitness to care for the children. The state at this point had the right, indeed the duty, to step in. The trial court did not err in finding that appellant's inability to protect the children when an emergency occurred was the required "nexus" between his incarceration and inability to discharge his responsibilities to his children. The adjudication of neglect is therefore
Affirmed.
NOTES
[*] At the time the briefs were filed, Mr. Hyden, Mr. Spagnoletti, Mr. Schwab, and Ms. Kaplan were called Assistant Corporation Counsel, Corporation Counsel, Acting Deputy Corporation Counsel, and Assistant Corporation Counsel, respectively. Since that time, however, the Mayor of the District of Columbia has issued an executive order re-designating the Office of Corporation Counsel as the Office of the Attorney General for the District of Columbia. See Mayoral Order No. 2004-92, 51 D.C. Reg. 6052 (May 26, 2004) (citing D.C.Code §§ 1-204-22(2) & (11) (2001)). We accordingly employ the new titles.
[1] A child is neglected under this subsection if a "parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity." The section has been recodified with no change in language at D.C.Code § 16-2301(9)(A)(iii) (2004 Supp.).
[2] Appellee points out that in her testimony, N.H. stated only that to the best of her knowledge it was appellant's intention that the children stay in her care while he was incarcerated. N.H. testified that she only found out that the father was incarcerated when court papers to that effect came in the mail to their apartment.
[3] The trial court made the placement permanent at a disposition hearing on January 9, 2002.
[4] The trial court found that appellant's children had visited with him six times from February to November 2001 and also had regular phone and letter contact. N.H. took the children to Morgantown, West Virginia for the visits. Appellant was able to play with his children and have lunch with them.
[5] The trial court's order also found that a fourth child, M.O., who was with the other three children at the time of their abandonment, had been neglected by L.O.C., the birth mother. The father of this fourth child was not appellant but another man, M.W. Since neither he nor the birth mother filed an appeal, no issues relating to M.O. are properly before us.
[6] The children were also found neglected under D.C.Code §§ 16-2301(9)(B) & (C) based on the mother's conduct and her substance abuse. Appellant has not raised any argument that the finding of neglect as to him was unnecessary given the neglect finding as to the children's mother. "[T]he statutory scheme ... is sufficiently durable to allow full resolution of all the neglect allegations even after the child has been found to be neglected based on only the allegations with respect to one parent." In re J.W., 837 A.2d 40, 44 (D.C.2003) (rejecting appellant father's argument that the trial court had no jurisdiction to adjudicate a neglect claim as to him where the mother had already stipulated to neglect because inter alia "individual judicial findings with respect to each parent are important steps toward subsequent disposition and permanency planning").
[7] In CA.S., we held that there was sufficient evidence to support a finding of neglect under 9(C) where the incarcerated father failed to make any alternative arrangements for his children's care, had been incarcerated most of their lives, and did not provide financial support for them. 828 A.2d at 193-94.
[8] At the hearing on January 9, 2002, the trial court specifically declined to make a finding that incarceration is per se evidence of neglect.