In re M.L., R.Y., Appellant.

No. 10–FS–423.

District of Columbia Court of Appeals.

Argued March 15, 2011.

Decided Sept. 8, 2011.

Thomas P. O'Toole, for appellant.

Anna Adamczyk, for appellee M.L.

Tobey K. Oliver, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for appellee District of Columbia.

Before BLACKBURNE–RIGSBY and OBERLY,* Associate Judges, and FARRELL, Senior Judge.

* At the time of argument, Associate Judge Noël Anketell Kramer was a member of the panel. Judge Kramer retired on May 1, 2011, and Judge Oberly replaced her on this panel.

BLACKBURNE–RIGSBY, Associate Judge:

Appellant R.Y. challenges the trial court's determination that he neglected his teenage daughter M.L. from August 2007 to February 2009, during which time M.L. did not attend school. On appeal, appellant contends that the trial court committed numerous errors in reaching its determination of educational neglect. In particular, we focus on appellant's claim that the court committed reversible error by admitting expert testimony and written reports regarding appellant's mental health without previously making an individualized determination that appellant's doctor-patient privilege should be waived. With respect to this claim of legal error, we hold that the Council of the District of Columbia ("Council") did not intend its passage of the Improved Child Abuse Investigations Amendment Act of 2002[1] to bar or restrict Superior Court judges from admitting the results of court-ordered mental evaluations in neglect hearings. Moreover, court-ordered mental examinations made pursuant to D.C.Code § 16–2315(e)(4) (2006 Supp.) are governed by the long-held rule in this jurisdiction that a doctor who examines an individual only for testimonial purposes has "no confidential relation" with the individual and the information gleaned from those examinations is not privileged. Taylor v. United States, 222 F.2d 398, 402 (D.C.Cir.1955); see also Kendall v. Gore Props., Inc., 236 F.2d 673, 683 (D.C.Cir. 1956). Therefore, such examinations are not subject to the specific waiver requirement present in D.C.Code § 4–1321.05 (2009 Supp.), which governs the admissibility of privileged mental examinations

1. D.C. L. No. 14–206, 49 D.C.Reg. 7815 (2002).

conducted for purposes other than testimony.

Additionally, we are unpersuaded by appellant's remaining claims that: (1) the trial court abused its discretion and violated appellant's due process rights by denying appellant's request to call M.L. as a witness in appellant's defense; (2) the court abused its discretion in admitting the written reports of the doctors who conducted the court-ordered mental evaluations of appellant, as those reports constituted inadmissible hearsay; and (3) the evidence was insufficient to support the trial court's finding of educational neglect. Accordingly, we affirm the trial court's finding of neglect.

## I. Factual Background

The facts in this case are largely undisputed. In summary, M.L. was born to her mother, A.L., and father, appellant R.Y.,[2] on October 8, 1992. On February 2, 2009, appellee District of Columbia filed a petition in Superior Court alleging that M.L. was a neglected child within the meaning of both D.C.Code §§ 16–2301(9)(A)(ii) and (iii) (2009 Supp.). Specifically, the government's petition alleged that M.L. was educationally neglected due to the fact that she had not been enrolled in school for over a year, and that her father suffered from "a mental incapacity that is impacting his ability to parent" M.L. The government alleged neglect pursuant to § 16–2301(9)(A)(iii) based on evidence that, during a three-year period from 2005 through 2008, appellant had reported to authorities a series of false allegations that M.L. had been sexually abused on more than five different occasions. In regard to M.L.'s educational neglect, the government proffered that appellant withdrew M.L. from school for an eighteen-month period, even though appellant acknowledged that M.L. was a special-needs student with cognitive limitations and a learning disability, and appellant was not trained to provide special education instruction.

Beginning on March 20, 2009, Magistrate Judge William W. Nooter presided over a five-day fact-finding hearing to determine whether M.L. was a neglected child.[3] Pursuant to Magistrate Judge Nooter's court order,[4] Dr. Craig King and Dr. Todd Christiansen, both employed by the District of Columbia's Department of Mental Health, conducted evaluations of appellant.[5] After performing numerous psychological tests, both doctors independently concluded that appellant suffered from "Delusional Disorder, Persecutory Type." Dr. King testified that appellant's delusions, that M.L. was being sexually assaulted by various individuals, were a substantial detriment to M.L.'s well-being because they forced her to live "within [appellant's] delusional world, literally changing the way [M.L.] thinks and acts." Ultimately, Magistrate Judge Nooter found that the government had estab-

---

2. The government notes in its brief that although "there was some question at the beginning of the case as to whether R.Y. was M.L.'s biological father or if he was only acting *in loco parentis*, paternity testing concluded after the trial showed that he is her biological father."

3. The day before the trial began, A.L. stipulated that M.L. was subjected to educational neglect by appellant, whom she contended she entrusted with making decisions concerning M.L.'s education, mental health, and medical care. Furthermore, A.L. agreed to cooperate with the government during and after the neglect hearing. A.L. did not file a brief on appeal.

4. Appellee District of Columbia requested, and appellee M.L. supported, the court order; appellant did not object.

5. Dr. King also conducted a psychological evaluation of M.L.

lished, by a preponderance of the evidence, that M.L. was a neglected child within the meaning of both D.C.Code §§ 16–2301(9)(A)(ii) and (iii). In a written order dated March 25, 2010, Associate Judge Maurice A. Ross found that Magistrate Judge Nooter did not err or abuse his discretion, and upheld the finding of neglect. Appellant now brings this appeal.

## II. Analysis

### A. Appellant's Court–Ordered Mental Health Evaluations Were Admissible in the Fact–Finding Neglect Hearing

■ Appellant contends that the trial court committed reversible error when it admitted expert testimony and written reports about appellant's mental health, over objection, without making an individualized determination that appellant's doctor-patient privilege should be waived in regard to statements made during the course of court-ordered mental evaluations.

■ Generally, "[e]xcept where otherwise provided by statute, the physician- or psychotherapist-patient privilege does not apply to communications ... during a mental examination or psychological test required by a court, or to a communication made after a court-ordered examination with respect to that examination." 81 AM. JUR.2D *Witnesses* § 444 (2004) (citations omitted). This exception to the general rules governing privilege is logical—a court-ordered examination is not for the purpose of treatment, but is rather geared towards determining the existence of a fact or condition for the court's benefit. *Id.*

In the D.C.Code, the provisions governing "[p]hysical and mental examinations" provide that the results of a court-ordered mental examination "shall not be admissible evidence in the fact-finding hearing unless the allegations contained in the petition set forth facts which support a petition pursuant to D.C. Official Code, section 16–2301(9)(C)." [6] The government interprets this subsection to mean that the results of a court-ordered mental examination are admissible where "the District's petition includes allegations that the parent's mental health status leaves them unable to properly care for the child." Therefore, the government contends that the expert reports and testimony were properly admitted because the petition in the present case alleges neglect based upon the parent's mental health status.

■ Ultimately, we agree with the government's interpretation of the statute and affirm the trial court's order. However, the government, in support of its argument, relied on the outdated version of § 16–2301(9)(C).[7] While § 16–2301(9)(C) formerly read: "[The term 'neglected child' means a child:] whose parent, guardian, or other custodian is unable to discharge his or her responsibilities to and for the child because of incarceration, hospitalization, or other physical or mental incapacity," it no longer contains such language.[8] The current version of § 16–2301(9)(C) reads: "Subparagraph (A)(viii), (ix), and (x) of this paragraph shall apply as of October 1, 2003." [9] The new language is the result of the Council's passage of the Improved Child Abuse Investigations Amendment Act of 2002 (the "2002 Act"). Taken together and read literally,

6. D.C.Code § 16–2315(e)(4).

7. We undertake the following statutory analysis in order to clarify the meaning of the current statute, and to avoid future litigation regarding this issue.

8. *Compare* D.C.Code § 16–2301(9)(C) (2001), *with* D.C.Code § 16–2301(9)(C) (2009 Supp.).

9. D.C.Code § 16–2301(9)(C) (2009 Supp.).

§§ 16–2315(e)(4) and –2301(9)(C) would now read: "The results of the mental or physical examination shall not be admissible evidence in the fact-finding hearing unless the allegations contained in the petition set forth facts which support a petition pursuant to *Subparagraph (A)(viii), (ix), and (x) of this paragraph shall apply as of October 1, 2003.*" (Emphasis added). In other words, the 2002 Act has now rendered § 16–2315(e)(4) unintelligible. When the literal meaning of a statute "produces absurd results," we do not follow it, but instead attempt to ascertain the legislative intention behind the statute by looking to the legislative history. *Varela v. Hi–Lo Powered Stirrups, Inc.*, 424 A.2d 61, 65 (D.C.1980) (en banc) (citing *District of Columbia Nat'l Bank v. District of Columbia*, 348 F.2d 808, 810 (D.C.Cir.1965)); *see also Blodgett v. Univ. Club*, 930 A.2d 210, 220 n. 8 (D.C.2007).

■ General canons of statutory construction dictate that, where the words of a later statute differ from those of a previous one on the same or related subject, the legislature must have intended them to have a different meaning. However, we are not bound to apply this canon where such an interpretation is unsupported by the statute's purpose and legislative history. *Gause v. United States*, 6 A.3d 1247, 1253–54 (D.C.2010) (en banc) (citing *United States v. Wilson*, 290 F.3d 347, 360 (D.C.Cir.2002)); *see also Grayson v. AT & T Corp.*, 15 A.3d 219, 254–55 (D.C.2011) (en banc) (Ruiz, J., concurring in part and dissenting in part); *In re A.O.T.*, 10 A.3d 160, 165 n. 15 (D.C.2010). Such is the case here. The stated purpose of the 2002 Act is: "to broaden and clarify the definitions

of child abuse, and to amend the circumstances under which child abuse reports can be expunged from the Child Protection Register; and to amend Title 16 of the District of Columbia Official Code to broaden and clarify the definitions of child abuse and neglect." [10] Prior to 2002, what constituted child neglect in this jurisdiction was defined more generally in only seven subsections. *See* D.C.Code § 16–2301(9)(A)–(G) (2001). With the passage of the 2002 Act, the Council restructured the definition of child neglect in the District of Columbia from seven lettered subsections to the current ten numbered subsections. *Compare* D.C.Code § 16–2301(9)(A)–(G) (2001), *with* D.C.Code § 16–2301(9)(A)(i)–(x) (2009 Supp.) However, in drafting and passing the 2002 Act, the Council did not update the cross-reference to § 16–2301(9)(C) in § 16–2315(e)(4).

Although the 2002 Act's stated purpose is silent on the issue of the admissibility of the results of a court-ordered mental examination,[11] reading the changed language in the subsection as signifying the intention of the Council to change the law to bar the admissibility of court-ordered examination results would contradict both the Council's earlier legislative history as well as our own case law. A 1977 Council Report explains that the Council earlier amended § 16–2315 "to permit the court to order [mental or physical] examinations before the fact-finding *and to admit the results* in such a hearing when the mental or physical incapacity of the parent or guardian has been alleged in the petition as a cause of the neglect. . . ." D.C. Council, Report on Bill 2–48 at 18 (Mar. 29, 1977) (emphasis added). If the Council sought to change the law regarding this

---

10. Improved Child Abuse Investigations Amendment Act of 2002, D.C. L. No. 14–206, 49 D.C.Reg. 7815 (2002).

11. The issue is also not discussed in the committee report recommending adoption of the amendment, nor is it discussed in any of the prior drafts of the legislation. *See* D.C. Council, Report on Bill 14–372 (May 29, 2002).

issue with the 2002 Act, then surely it would have so stated in the act or in the legislative history.[12] However, it did not.

Significantly, we recently stated that the 2002 Act "has no effect" on our analysis of § 16–2315 regarding the admissibility of court-ordered examination results. *See In re N.P.*, 882 A.2d 241, 243 n. 2 (D.C.2005). In *N.P.*, we found error in the trial court's admission of the results of a court-ordered mental examination where the underlying neglect petition did not provide any "factual allegations of mental illness or other incapacity...." *Id.* at 249. Prior to reaching our determination, we noted that: "The statute under which the neglect petitions were filed, D.C.Code § 16–2301(9) (2001), has since been amended by the [Improved Child Abuse Investigations Amendment Act], D.C. Law 14–206, 49 D.C. Register 7815 (2002). Subsections (9)(A), (9)(B), and (9)(C) of the 2001 version are now codified as D.C.Code § 16–2301(9)(A)(i), (ii), and (iii) (2005 Supp.), respectively. The amendment, however, has no effect on this case." *N.P., supra,* 882 A.2d at 243 n. 2. Moreover, we proceeded to conduct our § 16–2315(e)(4) analysis as though § 16–2301(9)(C) still pertained to a finding of neglect due to mental incapacity.[13] Similar to our analysis in *N.P.*, here we should construe § 16–2315(e)(4) as if § 16–2301(9)(C) still contained the pre–2002 language.

There are also persuasive policy arguments in support of construing § 16–2315(e)(4) in this manner. The Council enacted these provisions that confer upon family court judges the power to order psychological examinations and to use the results of the examinations to assist the court in making determinations of child neglect or abuse. Any concern about the privacy of this evidence would appear sufficiently addressed by § 16–2315(e)(4)'s requirement that the neglect petition sufficiently allege that the parent's mental or physical incapacity is a cause of the alleged neglect. *See* D.C.Code § 16–2315(e)(4). It seems unlikely that the Council intended to place another obstacle in the way of a family court judge's admission of evidence that may prove exceedingly beneficial to the court in making a determination of neglect.

■■■■ In addition to these policy considerations, we find further support for our interpretations of §§ 16–2301(9)(A) and – 2315(e)(4) in case law that, interestingly, was not cited by either party here. The long-held rule in this jurisdiction is that a doctor who examines an individual only for testimonial purposes—i.e., in preparation for testifying about the individual's physical or mental condition—has "no confidential relation" with the individual and, therefore, the information gleaned from such an examination is not privileged. *Taylor v. United States*, 222 F.2d 398, 402 (D.C.Cir.1955); *see also Kendall v. Gore Props., Inc.*, 236 F.2d 673, 683 (D.C.Cir. 1956).[14] In *Taylor*, the United States

---

12. *See Gause, supra,* 6 A.3d at 1254; *see also Grayson, supra,* 15 A.3d at 254–55 (Ruiz, J., concurring in part and dissenting in part) (noting that we have previously declined to presume that the legislature intended a departure from past practice when "the legislative history was absolutely silent on the issue and the statute's purpose did not support it").

13. *See N.P., supra,* 882 A.2d at 249 ("The petitions in this case did not meet this statutory standard. Dr. Gilliard testified about

B.P.'s mental condition at the hearing, but the government's neglect petitions contained very little in the way of actual facts to support a subsection (9)(C) claim of neglect.").

14. As both *Taylor* and *Kendall* were issued prior to February 1, 1971, when the D.C. Circuit remained the court of last resort for District of Columbia law, we recognize those decisions as binding precedent. *See M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971).

Court of Appeals for the District of Columbia Circuit crafted the following rule: statements made to a psychiatrist "in a professional capacity" are protected by doctor-patient privilege, but statements made during an examination for solely testimonial purposes are not protected by privilege and are admissible.[15] 222 F.2d at 402. Here, the expert testimony of Drs. King and Christiansen was governed by the *Taylor* rule and therefore was not protected by doctor-patient privilege.[16]

Appellant does not assert that the 2002 Act signified an intention by the Council to change the meaning of § 16–2315(e)(4). Instead, he directs our attention to D.C.Code § 4–1321.05, which provides that "the physician-patient privilege shall [not] be grounds for excluding evidence in any proceeding ... concerning the welfare of a neglected child; provided, that a judge of the Family Division ... determines such privilege should be waived in the interest of justice." Appellant interprets this section as requiring a specific finding of waiver by the court before any statement from a court-ordered examination may be admitted. For support, appellant cites *In re O.L.*, 584 A.2d 1230, 1233–34 (D.C.1990),

and *N.P, supra,* 882 A.2d at 249–50. In *O.L.*, we held that a specific finding that doctor-patient privilege should be waived was necessary before the neglect court could admit evidence of *prior* psychological treatment. 584 A.2d at 1233–34. In *N.P.*, we discussed *O.L.'s* specific-finding requirement in the context of a neglect hearing where the parent had been subjected to a court-ordered psychological examination but did not contend that it was privileged.[17] 882 A.2d at 249–50. Moreover, appellant contends that "Section 16–2315(e)(4) does not expressly deprive the trial court of discretion to either maintain or waive doctor-patient privilege, and it would be improper to read the provision as implicitly doing so." Appellant's argument is unpersuasive, because it cites our law outside of appropriate context. Had Drs. King and Christiansen examined appellant *prior to* Magistrate Judge Nooter's court-ordered examination, for a purpose other than subsequent testimony, the examination results would have been privileged and would have required a specific finding that "such privilege should be waived" prior to their admission pursuant to § 4–1321.05.[18] However, those are not the cir-

---

**15.** In *Kendall,* the D.C. Circuit applied the *Taylor* rule in a civil context. Specifically, the D.C. Circuit determined that there was "no showing on this record as to whether or not [the psychiatrist]'s duties as *admitting* physician at St. Elizabeth's Hospital place him in the category of an *examining* physician." *Kendall, supra,* 236 F.2d at 683. Unlike the record in *Kendall,* the record here clearly demonstrates that Dr. King and Dr. Christiansen examined appellant solely for the purpose of subsequent testimony regarding the court-ordered examination.

**16.** The case law of our neighboring state of Maryland, as well as other states, provides a rule similar to the *Taylor* rule. *See In re Alethea W.,* 130 Md.App. 635, 747 A.2d 736, 739 (2000) (determining that during a court-ordered mental evaluation "the professional's services are performed for the benefit of the

court rather than the individual; any benefit to the individual is incidental. The purpose of the privilege—to aid in effective treatment—is not served"); *see also People v. Lines,* 13 Cal.3d 500, 119 Cal.Rptr. 225, 531 P.2d 793, 803 (1975) (en banc); *Wiles v. Wiles,* 264 Ga. 594, 448 S.E.2d 681, 682 (1994); *State v. Mayhew,* 170 N.W.2d 608, 615–16 (Iowa 1969).

**17.** Instead, the *N.P.* parent successfully challenged the admissibility of the examination on the ground that the neglect petition did not sufficiently allege that the child was neglected due to the parent's mental condition. *N.P., supra,* 882 A.2d at 248–49.

**18.** Even if this were a case where specific waiver was required, the government also convincingly argues that the trial court satisfied such a requirement by finding that appel-

cumstances here. In this case, Drs. King and Christiansen only evaluated appellant pursuant to Magistrate Judge Nooter's court-ordered examinations. Therefore, pursuant to the *Taylor* rule, the results of those examinations were not privileged and were admissible in a neglect fact-finding hearing, according to § 16–2315(e)(4), as long as the underlying neglect petition alleged mental incapacity. As the neglect petition in the present case did allege mental incapacity, Magistrate Judge Nooter did not err in admitting the results of the court-ordered mental examinations because no privilege applied, and such evidence remains admissible pursuant to § 16–2315(e)(4).

### B. The Trial Court Did Not Abuse its Discretion in Precluding M.L. From Giving Live Testimony

■■ Appellant also seeks reversal on the ground that the trial court erred when it precluded appellant from calling M.L. to give live testimony. Appellant contends that the trial court's decision violated his due process right to a fair trial. Because appellant appeals the trial court's evidentiary ruling—a discretionary ruling that depends on the particular facts of each case—we review for an abuse of discretion. *See In re L.L.,* 974 A.2d 859, 862 (D.C. 2009) (citing *Brisbon v. United States,* 894 A.2d 1121, 1128 (D.C.2006)). Abuse of discretion requires a two-part inquiry. *See L.L., supra,* 974 A.2d at 862–63 (citing *Johnson v. United States,* 398 A.2d 354, 367 (D.C.1979)). First, the court must determine "whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal." *L.L., supra,* 974 A.2d at 862–63 (quoting *Johnson, supra,* 398 A.2d at 367) (internal quotation marks omitted).

■ We dealt with this precise issue in *In re Jam. J.,* 825 A.2d 902 (D.C.2003). Neglect proceedings require the trial court to engage in balancing parents' fundamental custodial rights over their children with the court's legal responsibility to act as *parens patriae* to protect children from harm. *Jam. J., supra,* 825 A.2d at 913. We held in *Jam. J.* that the trial court has the power to protect a child from the harmful effects of forced testimony "where a demonstrated risk of serious psychological or emotional harm to the child is not adequately mitigable by other means and substantially outweighs the parent's need for the child's testimony...." *Id.* at 917. We adopted a three-part balancing test that requires three case-specific factual determinations that must be made in order to justify excluding the child's testimony. *Id.* at 917–18. The *Jam. J.* test requires:

> First, the trial court must make a finding on the record that testifying would create a risk of serious harm to the child....
>
> Second, if the trial court finds that the child is at risk of serious harm from having to testify, the court must consider whether the risk can be alleviated by means short of prohibiting the testimony altogether....
>
> Third, after taking into consideration the risk of harm to the child and the possibility of ameliorative measures, the court must evaluate the prohibitive value of the child's testimony and the parent's concomitant need for it.

*Id.* at 917–18. The record indicates that the trial court was aware of the *Jam. J.* test and applied it correctly in the present case. Magistrate Judge Nooter expressly relied on expert testimony in his *Jam. J.* analysis: "So I think the [*Jam. J.*] analysis is appropriate to use, but I would find,

---

lant was told at the beginning of the mental evaluations that the information he provided

would not be confidential and that he could refuse to answer any questions asked of him.

based upon the testimony I heard, that there would be substantial harm, both based upon Dr. King's opinion and Dr. Alfano's opinion, regarding that." In considering the first prong of the *Jam. J.* test, Magistrate Judge Nooter based his conclusion on specific expert testimony.[19]

In explaining his finding with respect to the second prong of the *Jam. J.* test, Magistrate Judge Nooter explored many different ways to accommodate appellant's desire to have M.L.'s account on the record. Magistrate Judge Nooter discussed the option of live testimony in open court, an examination of M.L. in camera, an under-oath video interview, and the admission of out-of-court statements made during the course of court-ordered interviews.[20] After Dr. King testified that M.L.'s testimony in open court would subject her to the risk of mental and emotional harm, Magistrate Judge Nooter probed the expert further: "Well, what I want to ask the doctor [is] if there were some other method of doing it, either without the father present or even without the attorneys in the same room or possibly without them even asking questions.... Would that make any difference to the harm that you've testified to?" Dr. King responded that any type of questioning by a lawyer or judge would further traumatize M.L. This record overwhelmingly supports a determination that the trial court complied with the second prong of the *Jam. J.* test.

In applying the last prong of the *Jam. J.* test, Magistrate Judge Nooter pressed appellant for a proffer of the probative value of M.L.'s prospective testimony. The court reasoned that, whereas the excluded testimony in *Jam. J.* was the parent's attempt to cross-examine the children concerning their accusations against the parent, "M. has never accused Mr. Y of anything. She's never said anything negative about him. She has made statements regarding being sexually abused by other people. The statements that [appellant is] seeking, from what I gather, are not different from what these out of court statements are." Therefore, the record provides strong support for our determination that the trial court properly applied all three *Jam. J.* prongs.

We are unpersuaded by appellant's contentions that his interest in calling M.L. as a witness was "at a premium" due to what appellant alleges was the government's heavy reliance on M.L.'s out-of-court statements. The "at a premium" language derives from *Jam. J.*, *supra*, 825 A.2d at 919, dicta where we suggested that the trial court on remand consider the government's heavy reliance on the child's out-of-court statements in determining the importance of the parent's ability to confront the children's testimony in court. However, there is ample support in this record, based on the trial court's findings and analysis of the *Jam. J.* factors, for our determination that the trial court here did not err, let alone abuse its discretion.

### C. Appellant's Other Contentions on Appeal

 Appellant's final two grounds for appeal are also unpersuasive. Appel-

---

**19.** "Although expert testimony may not always be required, it will often be the best evidence" that testifying would create a risk of serious harm to the child. *Jam. J.*, *supra*, 825 A.2d at 917.

**20.** Ultimately the parties agreed to offer the portion of Dr. King's report that detailed M.L.'s responses regarding the alleged sexual abuse, and the parties stipulated to its admis-

sibility. We previously deemed this method to be an acceptable alternative in *Jam. J.*, *supra*, 825 A.2d at 918 ("The court may also explore alternatives to taking testimony from the child that would meet the parent's needs, such as admitting evidence of out-of-court statements made by the child or stipulations.").

lant contends that the trial court abused its discretion when it admitted the written reports of Dr. King's and Dr. Christiansen's court-mandated evaluations. Appellant argues that these reports were inadmissible hearsay because they were out-of-court statements and did not fall "within any recognized hearsay exception." We disagree. In admitting the reports, Magistrate Judge Nooter clearly explained his reasoning:

> All right, pursuant to 16–2315(e)(4) and over the father's objection, I will admit Government's Exhibit No. 2 with the clarification that information that was provided to Dr. King through what's been referred to as collateral sources or reports, are admissible not for the truth of the matters contained in those reports but solely for the basis of explaining Dr. King's opinions that he reached, although, of course, statements made by the father would be admissible for the truth of the matter because he is a party.

Magistrate Judge Nooter's ruling was entirely consistent with our case law recognizing that a court may admit expert reports containing hearsay, not for the underlying truth of the matter asserted, but rather as the basis for the experts' conclusions.[21] *See In re Ca. S.*, 828 A.2d 184, 191 (D.C.2003) (citing *In re Melton*, 597 A.2d 892, 901–02 (D.C. 1991) (en banc)). Magistrate Judge Nooter admitted the reports for precisely that purpose. On this record we cannot say that the trial court abused its discretion in admitting this evidence.

 Lastly, appellant contends that the trial court's finding of educational neglect was not supported by sufficient evidence. On review of a neglect determination, we view the evidence in the light most favorable to the government and draw every reasonable inference in its favor. *Jam. J., supra*, 825 A.2d at 910 (quoting *In re E.H.*, 718 A.2d 162, 168–69 (D.C.1998)). Our review respects the prerogative of the trial court, as the finder of fact, to determine credibility and weigh the evidence. *Jam. J, supra*, 825 A.2d at 910 (quoting *In re S.G.*, 581 A.2d 771, 775 (D.C.1990)).

Appellant contends that he initially received permission from the District of Columbia government to home-school his daughter and, therefore, any finding that he educationally neglected M.L. is negated. This argument mischaracterizes the record. Magistrate Judge Nooter based his neglect determination upon findings that appellant:

> [E]ducationally neglected [M.L.] by removing her from public school and "home-schooled" her for a year and a half. [Appellant] admitted that [M.L.] is cognitively delayed and entitled to special education services. He also admitted that he has not been trained to teach special education students. Therefore, it is clear by a preponderance of the evidence that [appellant] was not qualified to provide home-schooling to [M.L.] and that she was deprived of education services that she needed for a year and a half.

The court's finding of educational neglect was not based upon appellant merely with-

---

**21.** This common-law evidentiary rule shares its principles with Rule 703 of the Federal Rules of Evidence, which provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.*

(Emphasis added).

drawing M.L. from school—which appellant had permission from the District of Columbia government to do—but rather upon appellant's failure to provide M.L. with appropriate educational instruction. As such, the court's finding of neglect rests upon sufficient evidence.[22]

### III. Conclusion

The trial court did not err in admitting the results of appellant's court-ordered mental examinations. The Council did not intend to bar the admissibility of court-ordered mental evaluations with its passage of the Improved Child Abuse Investigations Amendment Act of 2002, and we recognize that we are bound by the long-standing law of the District of Columbia—as stated by the D.C. Circuit's opinions in *Taylor* and *Kendall*—that psychological evaluations conducted solely for the purpose of subsequent testimony are not protected by doctor-patient privilege. Further, we discern no error in the trial court's decision to preclude appellant from calling M.L. to testify in his defense. Lastly, we hold that the trial court's neglect adjudication was supported by sufficient evidence, and that the evaluation reports of Dr. King and Dr. Christiansen were properly admitted. For the foregoing reasons, we affirm the order of the trial court finding M.L. in neglect.

*So ordered.*

---

**22.** Magistrate Judge Nooter's finding of neglect was based upon appellant's mental incapacity as well. The government contends that, because appellant does not challenge the sufficiency of the mental incapacity finding, appellant lacks standing to challenge the sufficiency of the second, independent ground of educational neglect. We held in *In re Z.C.*, 813 A.2d 199, 202 (D.C.2002), that "without the potential for any remedial benefit from a decision by this court, [a parent] has no standing to bring this appeal." However, even assuming that appellant retains standing to challenge the sufficiency of the evidence, we determine that the evidence of neglect was sufficient on this record. Therefore, we need not determine whether appellant lacks standing.